## SUTTON STOVALL v. THE STATE.

### No. 4244. Decided February 26, 1908.

**1.—Murder—Manslaughter—Charge of Court—Maltreatment of Physician—Gross Neglect.**

Where upon trial for murder the evidence showed that the deceased lingered for some time after being stabbed with a knife by defendant, and the court properly submitted the issue of improper treatment and gross neglect as cause of the death, there was no error in refusing defendant's special. instructions on the same subject. Besides· the evidence did not show any improper treatment on the part of the physicians of the deceased.

**2.—Same—Evidence—Res Gestae—Statement of Deceased.**

Where upon trial for murder, the record showed on appeal that the deceased had made a statement after he was stabbed some twelve or thirty minutes thereafter, as to the occurrence of the difficulty, the same was res gestæ and admissible in evidence.

**3.—Same—Immaterial Testimony—Bill of Exceptions.**

Where upon appeal from a conviction of manslaughter, the bill of exceptions simply showed that the defendant objected to the testimony of the State's witness, who was his cousin and engaged to marry deceased, because the same was irrelevant, the same did not authorize a reversal.

**4.—Same—Expert Opinion—Evidence—Relative Position of Parties.**

Where upon trial for murder, a physician qualified himself as an expert witness and showed the range of the wound in deceased's body, such testimony was admissible, and did not relate to the relative positions of defendant and deceased at the time the wound was inflicted.

**5.—Same—Charge of Court—Murder. in First Degree.**

Where upon trial for murder, the defendant was convicted of manslaughter, he could not complain that the court erred in charging upon murder in the first degree.

**6.—Res Gestae Statement—Sufficiency of Evidence.**

Where upon trial for murder, the res gestæ statement of deceased was that he and defendant got into a difficulty, that he struck defendant in the breast, and that when he started to walk off defendant ran up behind him, stabbed him, and jumped to one side, a conviction for manslaughter was sustained.

Appeal from the District Court of Eastland. Tried below before the Hon. J. H. Calhoun.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*Scott & Brelsford,* for appellant.—On question of admitting res gestæ statement. State v. Hendricks, 73 S. W. Rep., 200. On question of expert testimony. Williams v. State, 30 Texas Crim. App., 421.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of manslaughter and his punishment assessed at four years confinement in the State penitentiary.

The charge of the court presents three phases of homicide, to wit: Murder in the first and second degrees, manslaughter, and assault to murder and aggravated assault. Appellant and deceased were both young men, had been living in Eastland County and knowing each other quite well for some time. On the night deceased received a stab at the hands of appellant they had both attended a party and about eleven o'clock at night went to the little town of Nimrod in said county. Russell Harvey, State's witness, testified, in substance, that he went from the party with deceased to Nimrod. Appellant was not there at the time they reached Nimrod but came afterwards. He was seven or eight steps west of the Manning storehouse and across the street from the Teague storehouse when he heard the deceased say, "O Boykin." At that time George Stovall and he were standing talking and when deceased called, George Stovall got on his mule and started off. Witness went across the street to where deceased was and asked him what was the matter, and Boykin Wilkinson said, "Sutton stuck a knife in Lanham." (Sutton is appellant and Lanham the deceased.) "We then carried deceased into the Teague storehouse. I got the key from Silas Teague and opened the door. Deceased was kind of reeling around and Boykin Wilkinson had hold of him. When we got to the gallery, the deceased said, 'Hurry, boys, I believe he has killed me.' I ran to Dr. Stephens', and then back to the store. When I got back to the store I had a talk with the deceased. It was not more than fifteen or twenty minutes after the cutting. I asked him how he was feeling, and he said he was feeling bad. He first asked me to go out and give Sutton Stovall a whipping, and I told him that that would do no good and I did not know whether I could do it or not. I then asked him how it happened, and he said he had asked Sutton Stovall out there; and asked him why he had been lying on him, and that Sutton said he had not been lying on him, and deceased told him that he had been; that Sutton said, 'You are a liar,; and then he (deceased) struck Sutton in the breast. That some one just at that time stepped off the gallery, and that he asked Sutton to come further back and started walking off and that Sutton ran up behind him and stabbed him and jumped to one side about ten feet. I do not remember whether the deceased said what he hit the defendant with or not. I think he said his fist; but I do not now remember that he said what he hit him with. I cannot be certain how long this conversation was after the cutting. I heard deceased call for help, and I was then only a short distance from him, about the distance across an ordinary street.

It did not take me more than a minute to go to him. A few words were spoken and we took him into the store. We did not wait a minute before starting with him to the front of the store. It was only thirty or forty feet to the front porch, and it did not take us more than a minute to go the distance. I helped him onto the gallery and ran about fifteen steps out in front, and got the store keys from Silas Teague and ran back and opened the door; that did not take more than a minute. I did not help deceased in the house but ran for Dr. Stephens. His house is not a hundred yards from the storehouse, and I ran. It did not take a minute. I told Dr. Stephens of the cutting, and he told me to go to the lot and get his case of medicine and instruments out of his buggy. I ran and got them. I was not in the house three minutes; and the buggy was not a hundred yards from the house. I had no trouble in finding the doctor's case of instruments. I got it and ran back to the store and got there before Dr. Stephens did. I passed by Silas Teague and the appellant as I went back to the store. I spoke to them, but did not stop. It was not two minutes from the time I got the case of instruments, until I was in the store. I set the case of instruments down and immediately had the conversation with the deceased that I have detailed, and it was over before Dr. Stephens got there. I was considerably excited and I ran rapidly when going after the doctor and in bringing the medicine case." This testimony is rehearsed, so as it presents the State's theory of this case.

Appellant's statement is as follows: Appellant in his own behalf testified: "After the party at George Stovall's, I came on down to Nimrod, and stopped at Teague Bros.' store. Lanham Broyles and several other boys were in the store, when I got there. I said to Lanham, 'Well, that was one more storm party in Texas' (by storm party we meant a surprise party). He said, 'Yes, that was the damndest party I was ever at, or I ever saw.' I bought a few pieces of gumdrop candy from Silas Teague, and ate it; and some of the candy stuck to my teeth. And while I was whittling me a toothpick out of a match to pick my teeth, they started to close the store, and I walked out on the gallery of the store with the knife and match in hand. As we walked out on the gallery the deceased said to me, 'Sutton Stovall, come here, I want to speak to you a minute.' It was dark and cloudy at that time, and had been misting rain. He led the way around the west side of Teague Bros.' storehouse until we got rather behind and south of a little oil room that is built onto the side of the storehouse somewhere about the middle of the west side. As we got there, the deceased stopped, and as I came up to him he said, 'I understand that you have been telling that I gave Estelle Stovall a drink of cider,' and I said, 'I did not.' And he says, 'Your mother and sister says that you did.' And I said, 'If my mother says it, I did, I will not deny anything my mother said.' Deceased then says, 'You and your mother both are damned lying sons of bitches.' And I said, 'You are another.' He said, 'God damn you, I will kill you,' and ran his hand in his pocket and

jerked it out, with something that I took to be a knife in it, and struck me in the breast; and as he struck me I had my knife in my hand, and I just made a jab at him with my knife. Deceased then turned off toward the store, and I walked off six or eight feet west of him, and we were standing there when the boys came up. Nothing more was said at that time between us. I had no idea of having any trouble with him when I went around the store building. I did not know what he wanted to talk to me about. We had never had a cross word or any ill-feeling that I know of in our lives before. We had been raised in the country together and had gone to school together and had always been good friends. I cannot tell you just how the blows were struck, as I was very much excited at that moment, as the whole thing came off unexpectedly to me." In addition to the State's case above suggested, the State shows that appellant walked off with a justice of the peace after the difficulty and when asked what was the matter, appellant persisted in replying "nothing" and never told his father the facts of the case until some time after the difficulty.

The defense further shows that the next day after the difficulty, appellant had a cut on his coat which he showed to parties. Deceased was stabbed in the right side about two and a half inches below the right nipple, a depth of about two inches and lingered something like thirty days before he died. We have made this statement of the case in order to properly treat appellant's various bills of exception and assignments.

Appellant complains that the court erred in failing to give appellant's special charge No. 1 which is as follows: "The jury are charged that, if they find from the testimony that the defendant, at the time and place alleged in the indictment, with a knife did inflict the wound in the body of the said Lanham Broyles, as charged, and they further find from the testimony that there has been gross neglect or manifestly improper treatment of said Lanham Broyles by the attending physician, attendants or nurses, attending him, between the time of the infliction of said wound and the time of his death, which improper treatment or neglect, if any, caused the death of said Lanham Broyles, then the jury cannot find the defendant guilty of taking the life of said Lanham Broyles, and if the jury so find from the testimony they will find the defendant not guilty." The court in his main charge gave the following: "Homicide is the destruction of the life of one human being, by the act, agency, procurement or culpable omission of another. The destruction of life must be complete by such act or agency, but although the injury which caused death might not, under other circumstances, have proved fatal, yet if such injury be the cause of death, without its appearing that there has been any gross neglect, or improper treatment by some person other than the defendant, such as the physician, nurse or other attendant, it would be homicide.

" Now, if you are satisfied from the evidence, beyond a reasonable doubt, that the defendant at the time and place charged in the indictment did, with a knife, cut and stab Lanham Broyles, the deceased,

and inflicted upon him a wound which was not in itself necessarily mortal, but which produced gangrenous pneumonia or other pneumonia, or malady that ultimately resulted in death, and which was brought about by no gross neglect or manifestly improper treatment upon the part of others, such as the physician, the deceased or attendant, then the party inflicting the injury would be as guilty of the homicide as if the wound would of itself inevitably have produced death.

"If you believe from the evidence that the defendant, Sutton Stovall, cut and stabbed said Lanham Broyles with a knife, thereby inflicting upon him a wound which was [not] necessarily of a fatal character, and would not of itself have caused death. And if you believe from the evidence that the deceased was manifestly improperly treated or that there was gross neglect by the physician or the nurse or the defendant or attendants, by reason of which the deceased contracted gangrenous pneumonia or other pneumonia or disease of the lungs that resulted in and caused the death of said Lanham Broyles, then you can not find that the defendant is guilty of taking the life of said deceased, or if you find from the evidence that the deceased died of pneumonia or other disease that was a result of the wound inflicted, upon Lanham Broyles, by the defendant, if any, you cannot find the defendant guilty of any grade of homicide, but you will consider whether or not the defendant is guilty of an assault with intent to murder, or of an aggravated assault, or whether he is entitled to an acquittal at your hands under all of the instructions and definitions given you in this charge heretofore and following."

The latter clause of said charge practically tells the jury to turn defendant loose (if it is properly copied in this transcript), since it says that if he died with pneumonia that appellant would not be guilty of any grade of homicide. Evidently there are some words left out of this clause of the charge since it is at variance with the other portions thereof. The balance of the charge is entirely proper and pertinent and appellant was not entitled to his special charge.

Special charges Nos. 2, 3, 4 and 5 all relate to the same matter and we hold that the charge of the court amply covered every phase of the theory of improper treatment suggested by the record in this case if such theory is suggested by the record. The doctor who treated deceased, testified that he put a drainage tube in the wound and used antiseptics and other remedies suggested by the best authorities for such character of injuries. The defense placed a physician on the stand and he practically corroborated the attending physician on this line. There is some slight discrepancy in their testimony as to what the attending physician told the other physician was the matter with deceased a short while before his death, but there is no contravention, as we understand this record, in the fact that the treatment was proper.

Bill of exceptions No 1 presents the following: "The State offered to prove and did prove the following facts, by Russell Harvey: That he had a conversation with deceased in Teague Bros.' storehouse some

twelve or fifteen minutes after the difficulty, in which witness asked deceased how it happened, and deceased replied: 'I asked Sutton why he had been lying on me and he said he had not been and I told him he had, and Sutton called me a liar and I (deceased), struck Sutton (defendant), in the breast. Some one stepped off the gallery then and I asked him to come on back further and started walking off, when he (Sutton) ran up behind me and stabbed me and jumped off to one side, three or four feet.'" This conversation occurred in the absence of defendant. Appellant objected to said testimony because it was in his absence, was not a voluntary statement made under such circumstances as would be res gestæ and was irrelevant and prejudicial; and the court overruled the objection and permitted the defendant to testify as set out, above. Which bill was approved, with the following qualification: "The witness Russell Harvey stated what he had done during the interval between the outcry at the time of the cutting and this conversation with the deceased, and it did not appear to the court that it was reasonably more than eight or ten minutes, to wit: That he had gone about the distance of across a street, helped the deceased on the gallery of the store and got a key for the door, which did not reasonably consume more than four minutes' time; then ran one hundred and fifty or two hundred yards and back, and got a doctor and brought a medical case, for which the witness allowed in his evidence some seven minutes, but which probably did not take four minutes, for Dr. Stephens, who lives there, says the distance is only about one hundred and forty yards and back; and that the witness made no perceptible halt, but was in a hurry. The evidence also shows that the deceased had fainted in the interval, which left but a short lucid time to frame a statement, though the witness did state that he did not know how long it was, and said it might have been over twenty or thirty minutes. The witness gave the full conversation had with deceased after his return from his trip for the doctor and medicine case as follows: 'I asked deceased how he was feeling. He answered that he was feeling pretty tough. He then asked me to go out and give Sutton Stovall a whipping. I told him that would do no good. I then asked him how it happened,' and that the deceased gave the answer as set forth in the bill of exceptions."

This testimony was clearly res gestæ, as indicated by a long line of decisions of this court, some of which we find in the State's brief, which are as follows: Tinsley v. State, 52 Texas Crim. Rep., 91; 106 S. W. Rep., 349; Jones v. State, 52 Texas Crim. Rep. 303; 106 S. W. Rep., 345; Mahoney v. State, 98 S. W. Rep., 854; Freeman v. State, 51 S. W. Rep., 230; Lewis v. State, 29 Texas Crim. App., 201; Franklin v. State, 88 S. W. Rep., 359; Chapman v. State, 65 S. W. Rep., 1098; Bice v. State, 51 Texas Crim. Rep., 133; 100 S. W. Rep., 949; Neely v. State, 56 S. W. Rep., 625.

Bill of exceptions No. 2 complains of the following: The State offered the witness, Estelle Stovall, who testified that she was the cousin of the appellant, and had been engaged to marry deceased, and the coun-

sel for appellant moved the court to withdraw the same from the jury, for the following reasons, to wit: Because said testimony was irrelevant, immaterial and prejudicial, and the court overruled the objections and appellant excepted to said ruling of the court. We are at a loss to know why this testimony was admitted. It did not and could not throw any light on the State's case, but certainly it would not authorize a reversal of this case. We apprehend that several girls in that neighborhood are related in some degree to appellant. It may be deceased had been engaged at some time to two or three of them for aught this record shows, or the different bills of exception indicate. Failing to conceive of any pertinency, or bearing, the testimony could have upon the case we can not be called upon to reverse same in the light of said fact.

Bill of exceptions No. 3 shows that Dr. Parks, for the State, testified the cut on the deceased ranged backward and upward. Appellant objected to said testimony on the ground that it was a conclusion of the witness; was not a matter upon which he was qualified to give an opinion; was not such a fact as the law permits an opinion to be given on; and because an examination of the witness disclosed that his examination was only ocular, superficial and external, and because said testimony was irrelevant, immaterial and prejudicial. The court qualifies the bill by stating that the doctor was a qualified surgeon, and regular practicing physician and graduate, and that in treating the wound and inserting gauze or drainage into it, he was acquainted with the course of the wound. This testimony was clearly admissible. Appellant in his argument before this court called our attention to that line of authorities which say that a doctor cannot testify to the relative positions of appellant and deceased at the time the wound is inflicted. This position is correct, but this court has uniformly held that the doctor could testify after examining the wound, as to the range of the wound, its extent, its size and the position of same in the body. This testimony would be very different from the doctor telling what position appellant stood in, at the time he inflicted the wound. This matter, as has been uniformly held by this court, must be left to the jury. There was no error in admitting said testimony.

Appellant further complains that the court erred in charging upon murder in the first degree. This question passed out by virtue of the verdict in this case. We find the charge of the court aptly and properly presented every phase of the law suggested by the evidence.

Appellant further insists that the evidence is insufficient to support the verdict. Taking the res gestæ statement of the deceased, which is legitimate proof to establish the fact, it makes appellant clearly guilty of manslaughter. The jury having settled the question on this issue against appellant, we do not feel inclined to disturb their verdict.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied without written opinion.—Reporter.]